# In the United States Court of Federal Claims

## OFFICE OF SPECIAL MASTERS

(Filed:  June 17, 2016)

\* \* \* \* \* \* \* \* \* \* \* \* \*  \*

| | | |
|---|---|---|
| HOLLY BRANNIGAN, parent of KB, a minor, | \* \* | Unpublished |
| | \* | No. 14-675 |
| Petitioner, | \* | |
| | \* | Special Master Mindy Michaels Roth |
| v. | \* | |
| | \* | Former Attorneys' Fees and Costs; |
| SECRETARY OF HEALTH AND HUMAN SERVICES, | \* \* | Contested; Reasonable basis. |
| | \* | |
| Respondent. | \* | |

\* \* \* \* \* \* \* \* \* \* \* \* \*  \*

Holly Brannigan, *pro se.*
Patricia Finn, Patricia Finn, P.C., Piermont, NY, petitioner's former counsel.
Darryl Wishard, United States Department of Justice, Washington, DC, for respondent.

## DECISION ON INTERIM ATTORNEYS' FEES AND COSTS[1]

**Roth,** Special Master:

On July 28, 2014, Holly Brannigan ("Ms. Brannigan" or "petitioner")  filed a petition for compensation, on behalf of her minor child, KB, under the National Vaccine Injury Compensation Program, 42 U.S.C. § 300aa-10, *et seq.*[2]  (The "Vaccine Act" or "Program").  By filing her petition, petitioner asserted that the Tetanus-Diphtheria-Pertussis ("Tdap" or "Td/Tdap") and Human Papillomavirus ("HPV") vaccinations administered on July 28, 2011, the influenza ("flu") and second HPV vaccinations administered on September 30, 2011, the third

---

[1] Because this unpublished decision contains a reasoned explanation for the action in this case, it will be posted on the United States Court of Federal Claims' website, in accordance with the E-Government Act of 2002, codified as amended at 44 U.S.C. § 3501 note (2012). In accordance with Vaccine Rule 18(b), petitioner has 14 days to identify and move to delete medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy.  If, upon review, I agree that the identified material fits within this definition, I will delete such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755 (1986). Hereinafter, for ease of citation, all "§" references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2006).

HPV vaccination administered on January 30, 2012, and the flu vaccination administered on September 12, 2012, caused KB to suffer from severe acne, incapacitating headaches, near syncopal episodes, dysautonomia, and Postural Orthostatic Tachycardia Syndrome ("POTS"). Petition ("Pet.") at 1-3.

## I. FACTS
### a. Petition[3]

The petition[4] in this matter states in pertinent part:  KB had a well child physical on July 28, 2011 (she was 11 and 4 months of age).  At this visit, she received a Tdap and her first HPV vaccination.  Pet. at 1.  On August 18, 2011, KB was seen by a dermatologist for acne on her face, chest, and shoulders and was given medication to treat her acne.  *Id.*  On September 30, 2011, KB received a flu vaccination and a second HPV vaccine.  *Id.*  On January 30, 2012, KB received her third HPV vaccine.  *Id.* at 2.  On September 12, 2012, KB received a flu vaccine. *Id.*  On October 25, 2012, KB presented to the pediatrician with headaches, for approximately nine days, for which she was unable to obtain relief with over the counter medications and seemed better when in a dark room.  *Id.*  The assessment was mixed tension and migraine headache; a computerized tomography ("CT") scan was ordered and was normal.  *Id.*  On November 8, 2012, KB was examined for "recurrent headaches, abnormal involuntary movements, [and] allergic rhinitis" and KB was given another flu vaccine.  *Id.*  A referral to neurology to evaluate involuntary movements was made.  *Id.*  On December 3, 2012, KB was seen by the pediatrician for an ankle injury and complaints of fatigue; blood work was ordered. *Id.*  On February 18, 2014, KB was taken to the emergency room with complaints of vision problems and headache.  *Id.*  She was kept overnight; a magnetic resonance image ("MRI") was done; the results were normal.  *Id.*  Consultations done at that time indicated that KB suffered from an anxiety disorder and symptoms were "psychogenic in nature."  *Id.* at 2-3.  On February 25, 2014, KB was seen by her pediatrician for "dizziness, rash, and tremors . . . [complaints] of a surge coming from the base of her neck to the top of her head, feelings of blacking out and actually blacking out, rash appearing on thighs and face, and legs and arms shaking uncontrollably."  *Id.* at 3.  She was unable to walk due to dizziness.  *Id.*  On March 3, 2014, KB was taken to the hospital for "severe headache, fainting spells, spasms of her muscles, unusual cold/hot sensation in her hands, feet and above her neck."  *Id.*  On March 4, 2014, KB was diagnosed with dysautonomia and POTS.  *Id.*

### b. Medical Records

The medical records filed with the Court two and four months after the filing of the Petition, on September 9, 2014 and November 14, 2014, respectively, are summarized as follows:  prior to vaccinations alleged to be causal here, KB was a healthy child with a past medical history notable for chronic stomach pain, food allergies, and allergic asthma.  Pet. Ex. 9

---

[3] Detailed facts, as set forth in the petition, are necessary for several reasons including: counsel's position that the petitioner contacted her on the eve of the statute of limitations, that the petition was filed on the eve of the statute of limitations, and counsel's assertion that a thorough analysis could not be done prior to the filing of the petition.

[4] The petition is not independently paginated.  The page numbers referenced are those assigned by CM/ECF.

at 1-3.  On July 28, 2011, KB received a Tdap vaccine and her first HPV vaccine.  Pet. Ex. 9 at 32-35, 37.  On August 18, 2011, KB visited a dermatologist with complaints of acne on her face, chest, and shoulders for a year.  Pet. Ex. 9 at 41.  KB was noted to be "alert, well appearing, and in no distress" and was given several topical acne medications.  Pet. Ex. 9 at 42.  On September 30, 2011, KB received a flu vaccination and the second HPV vaccination; "[n]o complications were observed during or immediately after administration."  Pet. Ex. 9 at 45.

The next recorded medical visit was not until June 7, 2012[5].  KB presented with pain in her left big toe.  Pet. Ex. 1.1[6] at 1.  A month later, she sought treatment for an ankle sprain and no other health concerns were noted.  Pet. Ex. 1.1 at 6.  KB continued to seek care for acne; no other medical concerns were noted.  Pet. Ex. 1.1 at 11-15.  KB received a flu vaccination on September 12, 2012.  Pet. Ex. 1.1 at 16.  About six weeks later, on October 25, 2012, KB presented to a doctor with headaches.  Pet. Ex. 1.1 at 17.  During this visit, KB reported throbbing headaches that began nine days prior and were unresponsive to over the counter medication, but occurred continuously.  Pet. Ex. 1.1 at 17-18.  She noted that she was taking doxycycline intermittently for acne, but had only taken it twice since the headaches began.  Pet. Ex. 1.1 at 17.  Examination noted no abnormalities. *Id.* at 18.  She was diagnosed with "mixed tension and migraine headache" and referred for a CT scan.  Pet. Ex. 1.1 at 18-19.

On November 8, 2012, KB returned to her pediatrician and received a flu vaccination.  Pet. Ex. 1.1 at 22.  She noted recurrent headaches that were triggered by "sustained continuous activity."  Pet. Ex. 1.1 at 22.  She was told to take ibuprofen as needed for headaches and to keep a headache symptom diary.  Pet. Ex. 1.1 at 25.  On December 7, 2012, KB was seen for an ankle sprain.  At that time, KB complained of fatigue. A basic metabolic panel, thyroid bloodwork, and complete blood count were ordered.  Pet. Ex. 1.1 at 34-35.  On February 13, 2013, KB presented for a well-child checkup at which time she received a meningococcal vaccination.[7]  Pet. Ex. 1.1 at 42.  She was noted to be healthy and was "[c]leared for school and sports activities."  Pet. Ex. 1.1 at 42-43.  For the remainder of 2013, the records reflect visits for routine illnesses and injuries including sore throat, acne, neck pain, abdominal pain, and upper respiratory infections.  Pet. Ex. 1.1 at 48-86.  KB had her next well-child checkup in July of 2013.  Pet. Ex. 1.1 at 59.  She was noted to be "[w]ell developed, alert and well nourished."  *Id.*

On December 30, 2013, KB received a flu vaccination.[8]  Pet. Ex. 1.1 at 93.  On January 23, 2014, KB complained of dizziness, fatigue, and headaches.  Pet. Ex. 1.1 at 95.  She was diagnosed with vertigo on January 31, 2014.  Pet. Ex. 1.1 at 100.  Labs performed in February 2014 were normal.  Pet. Ex. 1.1 at 123-125.  On February 18, 2014, KB was hospitalized for

---

[5] It was noted, in a different medical record, that KB received her third HPV vaccination on January 30, 2012; however, no medical records from that date appear in the record.  *See* Pet. Ex. 2 at 1.

[6] This exhibit is not independently paginated; therefore, the page numbers used are the page numbers assigned by the PDF software.  Additionally, petitioner filed exhibit 1 in two parts, Ex. 1.0 part 1 and Ex. 1.1 part 2.  These exhibits will be referred to as exhibits 1.1 and 1.2, respectively.

[7] Although KB received this vaccination, she is not alleging that it caused any condition.  *See generally* Pet.

[8] This vaccine is not alleged to have caused any problems.  *See generally* Pet.

aphasia, dizziness, and headache. Pet. Ex. 1.1 at 128-144. Specifically, her aphasia presented as a "sudden onset of problems reading." Pet. Ex. 1.1 at 144. Her discharge diagnoses, dated February 20, 2014, included anxiety disorder, headache, dizziness, aphasia, and hypoparathyroidism. Pet. Ex. 1.1 at 144. On February 25, 2014, KB was assessed as having dizziness, tremors, and a conversion disorder. Pet. Ex. 1.1 at 189-92. During a visit to her physician on February 28, 2014, petitioner noted that KB may be having seizures and that her brother was diagnosed with dysautonomia. Pet. Ex. 1.1 at 195.

KB was hospitalized from March 3-4, 2014, with headaches, fainting spells, muscle spasms and unusual cold and hot sensations. Pet. Ex. 1.1 at 198-212. Her symptoms were noted to be "consistent with dysautonomia." Pet. Ex. 1.1 at 199-203. She was hospitalized again on April 4, 2014 with a "sudden onset of very specific reading aphasia with normal neurological exam." Pet. Ex. 1.1 at 151. Her doctor's impression was a "[c]onstellation of symptoms including inability to read, headache, muscle twitching, dizziness, parethesias, and chest pains- all likely psychogenic in nature." Pet. Ex. 1.1 at 158. KB presented to the ER twice in April of 2014, both times being assessed as having POTS. Ex 1.1 at 223-25; Ex 1.2 at 6-11.

Multiple workups with specialists were done, including cardiology and endocrinology with no identifiable pathology being identified. Pet. Ex 1.2 at 24-26; 37-39. KB's brother was noted to have POTS with significant constipation and peripheral vascular nerve concerns. Pet. Ex. 1.2 at 64. KB's exam was noted as normal. Pet. Ex. 1.2 at 64-65.

Petitioner continued to seek treatment at Kaiser Hospital throughout 2014. *See generally* Pet. Ex. 1.2; Pet. Ex. 8 at 4-9. Test results were "[m]ildly abnormal" and showed pre-syncopal episodes, but she "did not meet criteria for postural tachycardia syndrome." Pet. Ex. 8 at 14; 17. On August 26, 2014, KB was diagnosed with orthostatic intolerance and complex spells with myotonic type discharges. Pet. Ex. 8 at 24. On September 29, 2014, results of a sleep study suggested idiopathic hypersomnia. Pet. Ex. 7 at 8-14.

## II.   PROCEDURAL HISTORY

The petition was filed on July 28, 2014 and this case was initially assigned to now-Chief Special Master Dorsey. *See generally* Pet.; Notice of Assignment, dated July 31, 2014. On September 9, 2014 and November 14, 2014, petitioner filed medical records[9] and documentation, labeled as Exhibits 1-6 and Exhibits 7 – 10, respectively. Notices of Filing, dated September 9, 2014 and November 14, 2014. Petitioner filed her first statement of completion on November 14, 2014; however, she later filed additional records on January 13, 2015; April 9, 2015; June 16, 2015; June 25, 2015; June 30, 2015 and October 9, 2015. Notices of Filings, dated January 14, 2015, April 9, 2015, June 16, 2015, June 25, 2015, June 30, 2015, October 9, 2015.

On October 2, 2014, Chief Special Master Dorsey held an initial conference at which time it was noted that the medical records were incomplete. Outstanding records were ordered to be filed by December 1, 2014 along with a Statement of Completion. An Amended Petition, to accurately reflect KB's symptoms and injuries, was suggested once outstanding medical records were obtained. Order, dated October 2, 2014.

---

[9] I relied upon these records in preparing the medical record summary above.

On January 22, 2015, respondent filed her Rule 4(c) Report ("Rule 4") stating that compensation was not appropriate in this case as the injuries were unclear.  Respondent's Report, dated January 22, 2015, at 13.  Respondent noted that KB had multiple vaccinations over several years and therefore respondent could not "comment on whether KB has [documented] residual symptoms of an alleged injury for six or more months" as required by the Vaccine Act.  *Id.* at 13.  Moreover, respondent pointed out that the petition alleged that KB received vaccinations causing her alleged injuries on July 28, 2011, September 30, 2011, January 30, 2012 and September 12, 2012 and "[a]s such, the timing between the last vaccination alleged (the September 12, 2012 flu vaccine) and the onset of symptoms (the October 30, 2013 note reporting headaches and spinning for five days and diagnosing vertigo) is too long for the vaccinations to be causative."  *Id.* at 14.  Respondent concluded that "given the records filed to date, this petition lacks a reasonable basis.  Without more, respondent reserves the right to challenge any attorneys' fees and costs related to this petition."  *Id.* at 14.

On February 10, 2015, Chief Special Master Dorsey held a Rule 5 conference and stated that "[a]fter reviewing the records and the petition, [she] identified issues, including the temporal association between certain vaccinations and the injuries alleged."  Order dated February 10, 2015, at 1.  The Chief Special Master "asked petitioner's counsel to consider whether the vaccines petitioner has identified in the petition that were administered in 2011 and early 2012 may be too far removed, temporally, from the alleged injuries."  *Id.*  Chief Special Master Dorsey then ordered petitioner to file outstanding and updated records, genetic testing results, records about other potential injuries, including narcolepsy and polycystic ovary syndrome ("PCOS"), raised during the conference, along with a statement of completion by April 13, 2015.  *Id.* at 1-2.  Once the documents were filed, petitioner had 90 days to file an amended petition and an expert report.  *Id.* at 2.

Various records were filed thereafter, along with several motions for enlargements of time to file an amended petition and an expert report.  Notices of Filing, dated April 9, 2015, June 16, 2015, June 25, 2015, June 30, 2015, October 9, 2015; Motions, dated April 14, 2015, May 13, 2015, September 28, 2015; Orders, dated April 15, 2015, May 14, 2015, September 29, 2015.  On October 19, 2015, the case was reassigned to me.  Notice, dated October 19, 2015.  The amended petition and expert report were not filed by the November 27, 2015 deadline.  Scheduling Order (Non PDF), dated December 3, 2015.  On December 3, 2015, I issued a non-PDF order granting a motion for extension of time and setting a December 18, 2015 date for the filing of the amended petition and expert report.  *Id.*  Again, neither was filed.  On January 12, 2016, I issued an Order to Show Cause for petitioner's failure to file the amended petition and expert report; I ordered petitioner to "file an expert report and an amended petition or otherwise show cause for why this case should not be dismissed for failure to prosecute."  Order, dated January 12, 2016.

On February 26, 2016, rather than complying with the Court's Order to Show Cause, counsel for petitioner filed a Motion to Withdraw as Attorney of Record.  Motion, dated February 26, 2016.  The Motion was stricken as it did not meet the Court's Rule 83.1(c)(5) requirements; it was refiled and granted on March 17, 2016.  Order (non-pdf), dated March 17, 2016; Motion, dated March 17, 2016; Order, dated March 17, 2016.  Thereafter, on March 23,

2016 and then again on March 25, 2016, counsel for petitioner improperly filed her motion for fees and costs, both motions being stricken as she was no longer counsel of record and the motions were filed electronically.[10]  Motions, dated March 23, 2016; Order, dated March 25, 2016.  On March 28, 2016, counsel filed a Motion for Leave ("Motion for Leave") to file for attorneys' fees and costs along with her Motion for Fees ("Motion") as exhibit 1 to the Motion for Leave.  Motion for Leave,[11] dated March 25, 2016.  Respondent filed a substantive response ("Response"), dated April 12, 2016.  She did not address the Motion for Leave or object to a finding of standing.  Response, dated April 12, 2016.  No Reply was filed and an Order finding standing and granting petitioner's Motion for Leave to File was issued on April 18, 2016.  Order, dated April 18, 2016.  A Reply ("Reply"), to respondent's substantive response on attorneys' fees and costs, was filed on May 4, 2016 along with a request for additional fees and costs.  Reply, May 4, 2016.

This matter is now ripe for decision.

## III.    APPLICABLE LAW

In general, the Vaccine Act permits an award of reasonable attorneys' fees and costs. §15(e).  Determining whether an application for fees is reasonable is a matter within the discretion of the presiding special master.  *See Carrington v. Sec'y of HHS,* 85 Fed. Cl. 319, 322-23 (Dec. 10, 2008).  Special masters are afforded considerable discretion when considering motions for attorney fees.  For instance, it is within a special master's discretion to reduce fees *sua sponte,* without warning to petitioners.  *Sabella v. Sec'y of HHS,* 86 Fed. Cl. 201, 208-09 (Mar. 2, 2009).

When considering motions for attorney fees and costs, the Court employs the lodestar method to determine the amount an attorney should be compensated for.  *Schueman v. Sec'y of HHS,* No. 04-693V, 2010 WL 3421956 (Fed. Cl. Spec. Mstr. Aug. 11, 2010); *see also Blanchard v. Bergeron,* 489 U.S. 87, 94 (1989) ("The initial estimate of a reasonable attorney's fee is properly calculated by multiplying the number of hours reasonably expended on the litigation times a reasonable hourly rate.") (internal citations omitted).  That said, a special master is not required to conduct a "line-by-line" analysis of a fee request.  *Broekelschen v. Sec'y of HHS*, 102 Fed. Cl. 719, 729 (Oct. 31, 2011).  Additionally, a special master is "entitled to use…prior experience in reviewing fee applications," including experience with particular attorneys. *Riggins v. Sec'y of HHS,* 406 Fed. Appx. 479, 481 (Fed. Cir. 2011) (citing *Saxton v. Sec'y, HHS,* 3 F.3d 1517, 1519 (Fed. Cir. 1993)).

---

[10] All motions in cases with *pro se* litigants must be filed in paper.

[11] The "Motion for Interim Payment of Attorney's Fees and Costs" was filed as an attachment, exhibit 1, to petitioner's Motion for Leave.  However, when referencing the Motion for Fees, I will use the short cite, "Motion", which will refer to the substantive Motion for Fees. Furthermore, the Motion for Fees and billing records (Tab 1) were not paginated in accordance with the Vaccine Rules.  The pages I cite to are those assigned by the PDF software.

### IV. DISCUSSION

Petitioner's counsel initially requested $30,848.31 in fees and costs. Motion, dated March 28, 2016.   In her Reply,[12] Ms. Finn requested $30,568.31 in fees and costs, an amount $280 less than her initial filing. Reply, dated May 4, 2016.

Respondent filed her Response to petitioner's Motion for Leave on April 12, 2016; however, respondent did not address petitioner's standing and instead asserted three substantive objections.  Response, dated April 12, 2016.  Respondent stated that interim fees and costs were not warranted in the case, at this juncture; that petitioner has not established a reasonable basis to pursue this petition for the entirety of the time period in which the requested interim fees and costs were incurred; and that the hourly rates sought for attorney Finn and her paralegal, Jessica Lucas, were not reasonable.  Reply, dated May 4, 2016.  Each issue will be discussed in turn.

1. **Challenges to the interim nature of fees and costs.**

Interim fees may be paid at the discretion of the special master.  *See Avera v. Sec'y of HHS,* 515 F.3d 1343, 1352 (Fed. Circ. 2008) ("Interim fees are particularly appropriate in cases where proceedings are protracted and costly experts must be retained.")  While they are not routinely awarded, interim fees may be awarded when petitioner's counsel withdraws from a case. See, e.g., *Woods v. Sec'y of HHS*, 105 Fed. Cl. 148, 154 (Fed. Cl. 2012).  However, "the mere fact that an attorney plans to withdraw is not necessarily a hardship that triggers an award of interim attorneys' fees and costs." *McKellar v. Sec'y of HHS*, 101 Fed. Cl. 297, 302 (2011).

Although I do not find the present proceedings to be protracted, I do find that with the petitioner now being *pro se*, withdrawing counsel may face undue hardship in getting petitioner's cooperation at the end of this matter.  I therefore find that resolving counsel's attorneys' fees and costs at this time is warranted.

2. **Challenges to reasonable basis.**

The Vaccine Act permits an award of reasonable attorneys' fees and costs, if the petition was "brought in good faith and there was a reasonable basis." §15(e)(1).  "Neither the Federal Circuit nor [the United States] Court [of Federal Claims] has had occasion to define the meaning of 'reasonable basis' for purposes of fee awards under the Vaccine Act," but it has been interpreted in several cases. *See, e.g., Woods,* 105 Fed. Cl. at 153.

Reasonable basis is typically viewed as "an objective standard determined by the 'totality of the circumstances.'" *Chuisano v. United States*, 116 Fed. Cl. 276, 286 (May 30, 2014) (citations omitted).  This somewhat amorphous standard has often been defined not by what it includes, but rather by what is lacking in cases in which a reasonable basis has been found not to

---

[12] In her Reply, Ms. Finn states that she filed a "revised invoice to include the additional time spent preparing the most recent filings in this case, including the Motion for Interim Fees and Costs." *See* Reply at 6, dated May 4, 2016.   However, there was no attachment included and Ms. Finn's office informed me that "no such revised invoice was intended to be included with this filing."  Reply, dated May 4, 2016; Order, dated May 9, 2016.

exist.  Typically, reasonable basis is not found when "fundamental inquiries are not made." *Di Roma v. Sec'y of HHS,* No. 90-3277, 1993 WL 496981, at *2 (Fed. Cl. Spec. Mstr. Nov. 18, 1993).  Additionally, a case may have a reasonable basis when filed, but may lose reasonable basis during the pendency of the case. *Perreira v. Sec'y of HHS,* 33 F.3d 1375, 1376-77 (Fed. Cir. Aug. 31, 1994); *McNett v. Sec'y of HHS,* No. 99-684V, 2011 WL 760314, at *6 (Fed. Cl. Spec. Mstr. Feb. 4, 2011).  Furthermore, the burden lies with petitioner to "affirmatively demonstrate a reasonable basis." *McKellar*, 101 Fed. Cl. at 305.  Some of the factors considered when assessing reasonable basis include: "'the factual basis, the medical support, jurisdiction issues', and the circumstances under which a petition is filed." *Chuisano*, 116 Fed. Cl. at 288 (citing *Di Roma,* 1993 WL 496981, at *1).  Neither the fact that no medical records or supportive expert opinion was filed nor the fact that the claim was filed beyond the statute of limitations automatically negates a finding of reasonable basis. *Chuisano*, 116 Fed. Cl. at 288 (citations omitted).  Furthermore, "[a] looming statute of limitations does not forever absolve a petitioner from his or her obligation to proceed with a reasonable basis to support his claim, at least not if the petitioner hopes to recover any fees and costs." *Chuisano,* 116 Fed. Cl. at 287 (citations omitted).

Ms. Finn states that she was retained on June 15, 2014 and the Petition was filed on July 28, 2014, approximately six weeks later.  Motion for Leave at 1; Motion at 1.  She states that "[w]ith little time to obtain the medical records and draft the petition, the original petition in this case noted a slew of vaccinations that KB had received as the vaccinations that caused the injury." Motion at 1-2.  She likewise stated "[u]pon a review of the medical records available at the time [that counsel was retained] it appeared that the minor petitioner was healthy and athletic up and until she received vaccinations beginning in July 2011." Motion, at 3 (reference to Pet. Ex. 1).

The billing records however suggest otherwise.   Between June 15, 2014 and July 28, 2014, Ms. Finn or her paralegal spent a total of 37.3[13] hours reviewing medical records and drafting, editing, and reviewing the petition.  Motion (Tab 1) at 7-8.

On September 9, 2014, a month and a half after the filing of the petition, Ms. Finn filed medical records designated as Exhibits 1 through 6.  *See* Notice of Filing, dated September 9, 2014.  On November 14, 2014, additional medical records and documentation were filed as Exhibits 7 through 10.  *See* Notice of Filing, dated November 14, 2014.  These records were used for the summary of KB's medical history during the pertinent time, set forth at length above by the undersigned.

As previously noted, at the Rule 5 conference held on February 10, 2015, Chief Special Master Dorsey noted issues with the temporal association between the vaccinations listed in the petition and the alleged injuries.  Order, dated February 10, 2015, at 1.  The petitioner was then

---

[13] I am granting all of the time billed between June 15, 2014 and July 18, 2014.  *See* Motion (Tab 1) at 7-9.  However, I cut Ms. Finn's paralegal's hours in half for June 16, 2014 as her billing records state that she attempted to open medical records but could not open them and, therefore, could not review them; therefore, what she spent time reviewing is unclear.  *See* Motion (Tab 1) at 7.

ordered to file all outstanding and updated records along with a statement of completion by April 13, 2015.  *Id.* at 1-2.  Thereafter, petitioner was provided 90 days to file an amended petition and an expert report.  *Id.* at 2.  The deadline for the amended petition and expert report was on or about July 13, 2015.

Instead, a year passed with only the filing of medical records and a multitude of motions for enlargements of time to file the amended petition and an expert report.  Notices of Filing, dated April 9, 2015, June 16, 2015, June 25, 2015, June 30, 2015, October 9, 2015; Motions, dated April 14, 2015, May 13, 2015, September 28, 2015; Orders, dated April 15, 2015, May 14, 2015, September 29, 2015. When the case was reassigned to me on October 19, 2015, the amended petition and expert report then due on November 27, 2015 remained pending. Scheduling Order (Non-PDF), dated December 3, 2015.  On December 3, 2015, I granted a motion for extension of time, setting a December 18, 2015 date for the filing of the amended petition and expert report.  *Id.*  Again, neither was filed.  On January 12, 2016, I issued an Order to Show Cause for petitioner's failure to file the amended petition and expert report; I ordered petitioner to "file an expert report and an amended petition or otherwise show cause for why this case should not be dismissed for failure to prosecute."  Order, dated January 12, 2016.  Over a month later, counsel moved to be relieved as counsel of record.  Motion to Withdraw, dated February 26, 2016

Despite the concerns raised by respondent in her Rule 4 filed on January 22, 2015, and by the Chief Special Master at the Rule 5 conference on February 10, 2015 regarding the specific vaccines alleged in the petition and the onset of injuries, there appears to be no analysis of the medical records conducted and no effort on counsel's part to evaluate the actual facts and medical history in order to amend the Petition.  Motion (Tab 1).

Likewise, the billing records indicate that an expert was not contacted until June of 2015, but the records were not provided to him until October of 2015, at which time the first discussion of the case took place.  Motion (Tab 1) at 11-12.  The expert apparently declined involvement. Motion (Tab 1) at 12.  Thereafter, two other experts were contacted each declining on January 13, 2016 and February 9, 2016, respectively.  Motion (Tab 1) at 13.  Following this sequence of events, counsel filed her Motion to withdraw.  Motion to Withdraw, dated February 26, 2016.

From the evidence presented in the record, reasonable basis does not exist for the entirety of the time billed.[14]  Counsel knew or should have known from the medical records in her possession as early as November of 2014 that the temporal relationship between the vaccinations alleged in the Petition and the injuries claimed to be associated with those vaccines were too remote in time to be causally related.  Based upon the foregoing, I find that reasonable basis for continuing with this matter ended on July 13, 2015, the first deadline for the filing of an amended petition and expert report.  In total, Ms. Finn will be compensated for 40.5 hours in 2014 and 5.2 hours in 2015 and her paralegal will be compensated for 17.6 hours in 2014 and 9.5 hours in 2015.  *See* Motion (Tab 1).

---

[14] Although this decision determines that petitioner's counsel had a reasonable basis to proceed for some amount of time, this decision does not decide the merits of this case.

### 3. Challenges to the amount of fees requested.

Whether a fee motion is made on an interim basis or after a case's conclusion, the requested sum must be "reasonable." §15(e)(1). It is for the special master to evaluate and decide whether this is the case. *See Perreira*, 27 Fed. Cl. at 34.

Determining the appropriate amount of an award of reasonable attorneys' fees requires first, applying the lodestar method by "multiplying the number of hours reasonably expended on the litigation times a reasonable hourly rate," *Avera*, 515 F.3d at 1347-48 (quoting *Blum v. Stenson*, 465 U.S. 886, 888 (1984)) and adjusting the lodestar calculation up or down by taking relevant factors into consideration. *Id.* at 1348. This is the standard for the calculation of a fee award in most cases where a fee award is authorized by federal statute. *See, e.g., Hensley v. Eckerhart*, 461 U.S. 424, 429-37 (1983).

The reasonable hourly rate is determined by the "prevailing market rate" in the relevant forum, *ie*, rates paid to similarly qualified attorneys in the forum where the relevant court sits (Washington D.C. for Vaccine Program cases), unless there is a significant differential between the forum rate and the local rate. *Avera,* 515 F.3d at 1348-50. Because attorneys practicing in the Vaccine Program are located all over the country, there is a disparity between the forum rate applicable to the Vaccine Program and the geographic forum in which the attorney practices, and therefore the rate must be adjusted following the lodestar calculation. *Avera*, 515 F.3d at 1349 (citing *Davis County Solid Waste Mgmt. & Energy Recovery Special Serv. Dist. v. EPA*, 169 F.3d 755 (D.C. Cir. 1999)).

Recently, in *McCulloch v. Sec'y of HHS*, No. 09-293V, 2015 WL 5634323, at *18 (Fed. Cl. Spec. Mstr. Sept. 1, 2015), after extensive analysis, Special Master Gowen stated with respect to rates for attorneys in the vaccine program

> [I]t appears that after adjustment for inflation and attorney rate increases that rates paid for attorneys with 20 or more years' experience range from about $300 an hour to $425. For practitioners having between 11 and 19 years' experience the rates range from $275 to $375 an hour, and based upon the very limited data of two practitioners with extensive vaccine experience relative to their years in practice, $275 to $325 for attorneys having between 8 and 10 years' experience. For attorneys having 4 to 7 years' experience, $250 to $300. For attorneys having fewer than four years in practice $150 to $200.

*Id.*

Once the hourly rate is determined, the reasonableness of the total hours expended must be considered. *Sabella v. Sec'y of HHS,* 86 Fed. Cl. 201, 205-06 (2009). The reasonableness inquiry involves consideration of the work performed on the matter, the skill and experience of the attorneys involved, and whether any waste or duplication of effort is evident. *Hensley,* 461 U.S.at 437.

Petitioner's counsel submitted billing for 2014 and 2015 at a rate of $400 per hour for herself and $200 per hour for her paralegal.  *See generally* Motion (Tab 1).  In relying upon *McCulloch*, she submits that "a rate that falls near the higher end of the second range, $300 to $375 an hour, would be appropriate because Attorney Finn has been practicing law for ten plus years, with a majority of cases involving Vaccine Injury and Vaccine Exemption."  Reply at 5.  Further, she elaborates that her "vast amount of experience in vaccine litigation coupled with her years of experience practicing law justify the court finding that Attorney Finn is entitled to a reasonable rate that falls near the higher end of the prescribed range in *McCulloch*."  *Id.*

Respondent submits that Ms. Finn was awarded $316 per hour and her paralegal $102 per hour in 2015 in *Rowan v. Sec'y of HHS*, No. 10-272V (Fed. Cl. Spec. Mstr. Dec. 30, 2015); *see also Rowan v. Sec'y of HHS*, No. 10-272V, 2014 WL 3375588, at *2-4 (Fed. Cl. Spec. Mstr. June 19, 2014)(awarding $300/hour for Attorney Finn for 2010-11 and $310/hour for 2012-2014, and awarding her paralegal $95/hour for 2010-2011 and $100/hour for 2012-2014)*; Becker v. Sec'y of HHS,* 2014 WL 4923160 (Fed. Cl. Spec. Mstr. Sept. 11, 2014), at *6-7 (awarding $310/hour to Attorney Finn for 2013-2014 and $100/hour for her paralegal 2013-2014).  Although these rates are not binding, I have considered these decisions when making my calculations.

As a result of the foregoing, and consistent with *Rowan* and *Becker*, I find that Ms. Finn is to be paid at a rate of $316 per hour for 2015 and a rate of $310 per hour for 2014.  Her paralegal is to be paid at a rate of $102 per hour for 2015 and $100 per hour for 2014.

I also find, for the reasons set forth above, and based upon a review of the records, the number of hours billed by Ms. Finn and her paralegal were reasonable up to July 13, 2015, with the exception of that which was reduced in footnote 12.

| | 2014 hours | Rates | Total | 2015 hours | Rates | Total |
|---|---|---|---|---|---|---|
| **Paralegal's compensation** | 17.6 | 100 | 1760 | 9.5 | 102 | 969 |
| **Ms. Finn's compensation** | 40.5 | 310 | 12555 | 5.2 | 316 | 1643.2 |
| | 58.1 | | **14315** | 14.7 | | **2612.2** |
| | | | | | | |
| | | | | **Sum Total:** | 16927.2 | |

The billing record submitted by counsel does not break out the fees and costs.  It appears that counsel had costs in the amount of $208.31,[15] which I am granting in full.  *See* Motion (Tab 1) at 9, 12.

---

[15] Counsel's billing record dated October 21, 2015 noted that a $1,000 payment was paid to Dr. Kinsbourne.  *See* Motion (Tab 1) at 12.  However, counsel's billing record clearly stated that this payment was "pd by client" and therefore, this amount was subtracted from the amount of costs counsel will be reimbursed for in this matter.  Furthermore, the billing records state that on

I, therefore, find that $16,927.20 in attorneys' fees and $208.31 in attorneys' costs are appropriate and reasonable in this matter.

### 4. Additional fees and costs

Counsel failed to attach Tab 1 to which she referred in her Reply for the additional attorneys' fees and costs. *See generally* Reply. When asked by my staff where the attachment was, her office replied that nothing was intended to be attached; thus, there is no additional billing and therefore, the issue of additional fees and costs is moot. Order, dated May 18, 2016.

### V.  TOTAL AWARD SUMMARY

For the reasons contained herein, **I award a lump sum of $17,135.51, representing reimbursement for all attorney's fees and costs available under §15(e)(1), in the form of a check payable jointly to petitioner, Holly Brannigan, and petitioner's former counsel of record, Patricia Finn, Esq.**

The Clerk of Court is instructed to provide a copy of this Decision to Ms. Finn at 628 Piermont Avenue, Piermont, NY 10968.

The clerk of the court shall enter judgment in accordance herewith.[16]

**IT IS SO ORDERED.**

s/Mindy Michaels Roth
Mindy Michaels Roth
Special Master

---

October 26, 2015, Ms. Finn's paralegal emailed the client about the balance of Kinsbourne's retainer and three days later, on October 29, 2015, a second payment was made to Dr. Kinsbourne. *See* Motion (Tab 1) at 12. Since the first payment was made by the client, I am not reimbursing Ms. Finn for the costs of paying Dr. Kinsbourne. Ms. Finn did not clearly delineate what costs she incurred and which her client incurred.

[16] Entry of judgment can be expedited by each party's filing of a notice renouncing the right to seek review. *See* Vaccine Rule 11(a).